JACK WOLF, JR., v. THE STATE.

No. 7483. Decided March 28, 1923.

Rehearing denied June 29, 1923.

1.—Murder—Manslaughter—Charge of Court—Provocation.

Where, upon trial of murder, the court gave the following charge on manslaughter according to Article 1129 C. C. P., "It is not enough that the mind is merely agitated by passion arising from some other provocation or a provocation given by some person other than deceased," there was no error, under the facts of the instant case which showed that the provocation was given by some other person than deceased. Distinguishing Harrison v. State, 83 S. W. Rep., 699, and other cases.

2.—Same—Deadly Weapon—Charge of Court.

Where the court's charge on self-defense gave to the jury the language of Article 1106 P. C., and also a definition of the use of a deadly weapon, which was a sufficient application of the law to the defensive theory, finding support in the testimony, there is no reversible error.

3.—Same—Charge of Court—Deadly Weapon—Statutes Construed.

The court's definition of a deadly weapon in his charge on self-defense, applicable to the instruction presenting Article 1147 and Article 1149 P. C., applying to the facts of the case, is proper, and there is no reversible error.

4.—Same—Argument of Counsel—Rule Stated.

To circumscribe the argument of State's counsel to where same would not transgress the bounds of propriety as fixed by those who defend would be to give to the defendant or those charged with crime weapons of appeal and denunciation, and deny their use to those representing the State; this court will not go this far.

5.—Same—Acts and Declarations of Third Parties.

In the absence of a discussion or reference to the incident that the mother of deceased fainted during the argument, in the jury room or in the argument, there is no reversible error.

**6.—Same—Newly Discovered Evidence.**

Where there was sufficient communication with the witness in question to furnish the basis of a satisfactory claim that he knew the facts now asserted by him, a sufficient showing should have been made that the witness would give the testimony referred to, and there was no error in overruling the motion for a new trial upon the ground of newly discovered evidence.

**7.—Same—Sufficiency of the Evidence.**

Where, upon appeal from a conviction of murder, the evidence is sufficient to support the conviction, there is no reversible error.

**8.—Same—Rehearing—Statutes Construed—Deadly Weapons—Intent.**

For practical purposes in the trial of cases a condensed statement of Article 51 and 1147 P. C., might be made thus: If there be an issue as to the deadly character of the instrument used, when ordinarily used in similar cases, the question of the intent to kill should be submitted to the jury, and they should be told in appropriate language that if in such case they do not find that the defendant intended to kill they could not find him guilty of any grade of felonious homicide, and the court having properly instructed thereon, and in addition thereto gave a requested charge on the part of the defendant, there is no reversible error. Distinguishing Shaw v. State, 34 Texas Crim. Rep., 433, and other cases.

**9.—Same—Argument of Counsel.**

Where this court in none of the arguments objected to finds any statement of evidence *de hors* the record, nor is there any personal abuse or vituperation, nor such inflammatory language as would call for a reversal of the case, there is no reversible error.

Appeal from the District Court of Coryell. Tried below before the Honorable J. R. McClellan.

Appeal from a conviction of murder; penalty, twenty years imprisonment in the penitentiary.

The opinion states the case.

*H. E. Bell,* and *McClellan & Cross,* for appellant.—On question of court's charge on manslaughter, McDowell v. State, 151 S. W. Rep., 1049; Craft v. State, 122 id., 547; Gallagher v. State, 115 id., 46; Fuller v. State, 113 id., 541; Harrison v. State, 83 id., 699; Moore v. State, 88 Texas Crim. Rep., 624.

On the question that the statute was applicable in view of the evidence that deceased was attacking with brass knucks or a knife; Briscoe v. State, 236 S. W. Rep., 990; Hudson v. State, 129 id., 1125; Duke v. State, 120 id., 894; Edwards v. State, 151 id., 294.

On the question of deadly weapon, Johnson v. State, 60 S. W. Rep., 48; Crow v. State, 116 id., 52;; Betts v. State, 133 id., 253; Poole v. State, 137 id., 666; Reeves v. State, 168 id., 860; and cases cited in the opinion.

*R. G. Storey,* Assistant Attorney General, and *Watt L. Saunders,* County Attorney, for the State.—On the question of deadly weapon,

Spencer v. State, 128 S. W. Rep., 118; Briscoe v. State, 236 id., 991; Gunn v. State, No. 6459, recently decided.

On question of intent to kill, Alley v. State, 241 S. W. Rep., 1024; Betts v. State, 133 id., 351.

LATTIMORE, JUDGE.—Appellant was convicted in the District Court of Coryell County of murder, and his punishment fixed at twenty years in the penitentiary.

Appellant's first contention in his brief is of the court's charge on manslaughter wherein the jury were told: "It is not enough that the mind is merely agitated by passion arising from some other provocation, or a provocation given by some person other than deceased." This is part of the statutory definition of sudden passion as appears in Article 1129 of our Penal Code in connection with the law of manslaughter, and same was given in the instant charge as part of such definition. Appellant's objection is that this was a limitation upon his rights not suggested by any evidence in the case. The killing took place at a dance. Deceased went to this dance with Miss Bird. While at the dance and just prior to the killing appellant had a talk with Miss Bird. She testified that he tried to make a date with her and that she refused, and he said to her that some one had told her lies on him. This she denied to him. She also said that at the time of this conversation appellant seemed mad,— not at the start but later he seemed mad. There is also in testimony evidence reflecting prior ill-will on the part of the appellant toward deceased and threats to do the deceased harm. This much of the evidence is here stated because it makes plain that the law of this case differs from that of the cases cited by appellant in support of this proposition. In Harrison v. State, 83 S. W. Rep., 699 cited, there was no charge given on manslaughter, hence no applicability. In Fuller v. State, 54 Texas Crim. Rep. 454, 113 S. W. Rep., 541, there was no evidence suggesting that the anger or rage of the accused was caused by provocation brought about or arising from the conduct of another, or from something said or done by such other party. In Gallagher v. State, 55 Texas Crim. Rep. 50, 115 S. W. Rep., 46, two strangers met in a road, quarreled over who had the right-of-way and one killed the other. It was held, even in such case, that a charge similar to the one under discussion would not be reversible error, but it was suggested that upon another trial it be omitted as not finding support in the testimony. In Craft v. State, 57 Texas Crim. Rep., 257, 122 S. W. Rep. 547, it appeared that deceased caught the horse of appellant by the bridle and jerked it and caused it to rear, throwing appellant against the horn of the saddle and inflicting pain upon him. He asked a special charge applying the law of manslaughter which we held wrongfully refused. There was not a word of testimony supporting the proposition

of provocation by another or anger caused by some one other than deceased. Announcing its conclusion that a reversal was necessary for other reasons, this court said that if the facts were the same on another trial, a charge similar to that here complained of should not be given. McDowell v. State, 68 Texas Crim. Rep., 577, 151 S. W. Rep., 1049, was reversed for other errors, this court stating in its opinion that it was a fact undisputed in the testimony that the difficulty came up all in a moment and that there was no ill-will or grudge between the parties prior to the incidents of the fatal difficulty itself. We are unable to apply anything found in any of said authorities as supporting the contention made in the instant case under the facts stated by us above. It appears clear, from the State's testimony, that appellant was angered by the refusal of Miss Bird to make a date with him and by her denial of the fact that deceased had told her things on him. We find no error in the charge complained of under the facts.

In paragraph thirteen of the charge in connection with the law of self-defense, the court gave to the jury the language of Article 1106 of our Penal Code. No exception was taken to said paragraph, but in the tenth exception to the court's charge we find the following:

"Defendant further objects to said paragraph 14 and to the whole charge because it omits to apply the law concerning the use of a deadly weapon by deceased to the facts of the case."

Paragraph fourteen of the court's charge gave the jury an application of the law to the facts both as to real and apparent danger, and was as follows:

"If, therefore, the defendant killed the deceased, he was justified in doing so, if he did do so, to prevent the deceased from murdering him, or from inflicting serious bodily injury upon him, the defendant, provided it reasonably appeared to the defendant, by the acts, or by the words coupled with the acts of the deceased that it was the purpose and intention of the deceased to murder the defendant, or to inflict serious bodily injury upon him, the defendant viewed from the defendant's standpoint. And provided the killing took place while the deceased was in the act of committing such murder, or of inflicting such injury, on the defendant, or after some act done by the deceased showing evidently an intent to murdur the defendant, or to inflict serious bodily injury to him, the defendant, viewed from the standpoint of the defendant. And if it reasonably appeared to the defendant from the circumstances of the case that danger existed, he had the same right to defend himself against such apparent danger and to the same extent that he would have were the danger real. And this, even though there was no real danger. And if you have a reasonable doubt as to whether or not the killing took place under such circumstances it will be

your duty to give the defendant the benefit of such doubt and acquit him."

This we deem a sufficient application of the law to the defensive theories finding support in the testimony in this case. Appellant did not claim that deceased tried to take his life, or to maim him, or inflict serious bodily injury upon him, nor did he try to describe any weapon with which he claimed deceased had struck him prior to the fatal cutting. On direct examination appellant testified that immediately before he cut deceased the latter went into his pocket and got out something and hit him; that he thought it was brass knucks or a knife. On cross-examination he admitted that he did not know what it was that deceased hit him with; that he could not see what it was; that he could not see any part of it and did not in fact see any part of it; that he only knew that deceased hit him with something that raised a bump on his hand; that deceased.only struck one lick, and that he, appellant, got out his knife and as deceased advanced again appellant cut him with said knife. The carotid artery of deceased was severed by the blow and he died almost at once. No weapon of any kind was found on or around his person, his pocket knife being closed and in his pocket when his body was searched after death. Appellant's description of the result of the lick made at him by deceased is as follows:

"At the time of the trouble I received a lick on the head given by Willis Hopson. The lick was on top of my head along up there in the hair. It was a gash and made a bump on my head. The bump was a little bit bigger than your thumb, I guess. . . . I showed the bump to Tuck (Wolf) and to you (Mr. Bell). The wound bled. I couldn't see how big a place it was."

Appellant's father was not at the dance but testified that when appellant got home that night he showed him the place on his head and it had blood on it. He said of the injury: "The broken place on the skin of Jack's head was a jagged place, just one dent, a rough dent in the skin." He also said: "I found a small place on Jack's head, something like the big end of your thumb, looked like he was hit with a knife; I just found a knot there. The skin was broken where he was hit." This witness said that he had a doctor to examine appellant's head but the record does no contain the testimony of such doctor. No other witness testifies that deceased had any weapon or assaulted appellant with one on said occasion. Nothing in the authorities cited by appellant or in any known to us would seem to require a charge applying an application of the legal presumption contained in Article 1106, supra, in a case where there was no more testimony of an attempt on the part of deceased to inflict murder, maiming or serious bodily injury, then appears in the instant record. We do not deem it necessary to discuss or

95 T. C.—16

analyze the authorities cited, believing a statement of the facts in this case enough to show the soundness of our conclusion.

It is also urged that the court's definition of a deadly weapon was erroneous as applicable to the instruction presenting Articles 1147 and 1149 of our Penal Code. The learned trial judge herein gave to the jury in his charge the provisions of Articles 1147 and 1149, supra, and we quote in part from the charge applying said articles as follows:

"Now, in passing upon the intent of the defendant in this case, you will take into consideration the instrument if any used by him in inflicting death upon the deceased, and, if you should find from the evidence in this case that the instrument so used, if any, was one not likely to produce death, then, in that event, it is not to be presumed that death was designed, unless, from the manner in which it was used such intention evidently appeared. And in passing on this question you will take into consideration all of the evidence before you.

In accordance with the foregoing instructions, you are instructed that where a homicide occurs under the influence of sudden passion, but by the use of means not in their nature calculated to produce death, the person killing is not deemed guilty of the homicide unless it appears that there was an intention to kill, but the party from whose acts the death resulted, may be prosecuted for, and convicted of any grade of assault.

You are charged, therefore, that if you believe from the evidence, beyond a reasonable doubt, that the defendant cut or stabbed the deceased with a knife and thereby killed him, but you further believe that the stab or cut was given under the influence of sudden passion, as that term has hereinbefore been defined, and that the knife used was not calculated to produce death in its usual, customary and ordinary use, that is as a weapon, the knife would not ordinarily produce death and further believe that there was no intention on the part of the defendant to kill the deceased, then you cannot convict the defendant of any higher offense than aggravated assault."

The State's testimony shows that after appellant's conversation with Miss Bird, that he said he was going to whip the G—d—son of b— and was going to kill him if he could. King Potter swore that appellant asked him where deceased was and said he wanted him,— wanted to cut his G—d—guts out. It is not disputed that appellant called deceased out of the house and that they walked together out to where the cutting took place. Appellant said when they got outside the yard he asked deceased if he had been telling lies on him and that deceased replied that anyone who said that he had been doing so was a G—d d—n liar, and at once struck appellant

and knocked him back and staggered him; that he, appellant, got out his knife and cut deceased as the latter again advanced upon him.

There is no testimony in the record as to the size of said knife or the length of its blade, or suggesting that it was not a weapon which used in striking or cutting, would not ordinarily inflict death or serious bodily injury. We are of opinion that the charge as quoted sufficently applied the law of the articles last referred to, to the facts. It was manifestly not the court's duty to tell the jury to *acquit*, if they did not believe said knife was a deadly weapon; but it was his duty, after presenting the question that if the jury were not satisfied that it was a deadly weapon, to then proceed to consider the charge on manslaughter and aggravated assault. We think there is no merit in appellant's complaint of the charge in the regard just considered, nor in refusing special charges Nos. 3, 4 and 6 which were substantially in accord with the charges as given.

There are ten bills of exception to the argument of attorneys for the State. Their length precludes our setting them out, but we have given to each our careful attention. An explanation is attached to one of said bills and referred to in the approval of others, stating that appellant's attorneys had made inflammatory appeals to the jury not to disgrace the old gray haired father of appellant, etc., etc., and that in the opinion of the court much of the appeal complained of by appellant was in reply to similar appeals made by his attorneys. In none of said bills does there appear any statements of material facts dehors the record from which statements conclusions of guilt might be reached, and none of said bills reflect personal abuse of appellant. They consist for the most part in appeals to uphold the law, to be mindful of the parents of the deceased and of their loss and to keep in mind the destruction of the life of this young man and to do their duty as counsel for the State saw it. To circumscribe the argument of State's counsel to where same would not transgress the bounds of propriety as fixed by those who defend, would be to give to the attorneys for those charged with crime weapons of appeal and denunciation and deny their use to those representing the State. We are not willing to go this far.

That the mother of deceased fainted during this argument, was made the subject of complaint in the motion for new trial, and the evidence of part, if not all, of the jurors was heard by the court in passing upon said motion. As we understand the record it appears that the mother of deceased was seated in the audience and had not testified in the case, and was not known to the jurors with possibly one or two exceptions. As we read the record there was no discussion or reference to this matter in the jury room or in the argument, and we are not led to believe that the trial court exceeded his discretion in refusing the new trial asked for this reason.

Appellant set up in his motion for new trial newly discovered

testimony but the motion was not supported by the affidavit of the new witness or of anyone who had talked to or communicated with him, nor is there other evidence of the truth of the assertions in said motion such as would have justified the trial court in acting favorably thereon. It is alleged in the motion that the attorneys for appellant had talked with the witness whose testimony is set up as newly discovered, and it is asserted that he misled them or stated falsely to them, but there is no affidavit by said attorneys giving the communication had by them with said witness. It is manifest that under a verdict such as given in the instant case appellant must have been confined in jail from the time of conviction until now. If in fact there was sufficient communication with the witness in question to furnish the basis of a satisfactory claim that he knew the facts now asserted to be provable at his hands, we think sufficient showing should have been made to the trial court in connection with the motion for new trial to satisfy him with some reasonable certainty that the witness would give the testimony referred to.

The State's case showed bad feeling on the part of appellant toward deceased, and threats made by him prior to the night of the homicide to the effect that he was going to whip deceased, and that deceased had told lies on him, and that deceased was a coward and would not fight. It was in testimony that appellant had said that he was going to talk to Miss Bird and find out if deceased had told certain things on him. This testimony connects closely with the actions of appellant on the night in question. If Miss Bird's testimony is true, he did come to her and after a talk with her in which she asserts that she told him positively that no one had told her any lies on him, that this, coupled possibly with her refusal to make a date with him, aroused his anger, is supported by her testimony; that at once he began seeking deceased and called him from inside the house out into the darkness, and that he told him he wanted to talk to him and went with deceased away from the crowd out to the point where the cutting took place almost immediately, is also without dispute. Three witnesses who saw appellant after his conversation with Miss Bird testified to his serious threats toward deceased. The cutting took place outside the yard in the darkness. Deceased ran back into the yard in a circle and fell and expired without making any statement. On that night and afterwards appellant asserted that he did not know who struck or cut deceased. He made no claim on that night to any of the parties with whom he talked of any claim of self-defense. He says that he talked to Tuck Wolf, apparently a relative, immediately after the cutting. Tuck Wolf was not used as a witness on behalf of appellant. Appellant's father says that when appellant got home that night he told him

that he and deceased had a fight and that deceased struck him with something, and that when he straightened up deceased was coming at him.

We think the evidence sufficient to support the conclusion reached by the jury, and finding no reversible error in the record, an affirmance is ordered.

*Affirmed.*

## ON REHEARING.

### June 29, 1923.

LATTIMORE, JUDGE.—Article 51 of our Penal Code is as follows: "The intention to commit an offense is presumed whenever the means used is such as would ordinarily result in the commission of the forbidden act."

Article 1147 of our Penal Code is as follows: "The instrument or means by which a homicide is committed are to be taken into consideration in judging of the intent of the party offending; if the instrument be one not likely to produce death, it is not to be presumed that death was designed, unless, from the manner in which it was used, such intention evidently appears."

As we understand the above articles in the light of the language used and the decisions of this court, the presumption referred to in Article 51, supra, does not obtain in a given case under Article 1147, supra, when the instrument used is one not likely to produce death, *unless* from the manner of its use the intent to kill evidently appears. The converse of this statement would be that if, from the manner of the use of a weapon not per se deadly, the intention to kill evidently appears, the presumption referred to in Article 51, supra, would obtain.

Article 1147, supra, is a limitation on Article 51, and in cases where the instrument used is not per se deady, i. e., not likely to produce death when used as a weapon to cut or stab with in ordinary cases like the one before us, the presumption referred to in Article 51 does not obtain, *unless* from the manner of the use of such weapon the intention to kill evidently appears. The presumptions referred to are of law. Border v. State, 42 Texas Crim. Rep. 648; Spivey v. State, 45 Texas Crim. Rep. 496; Burnett v. State, 46 Texas Crim. Rep. 119; Gallagher v. State, 55 Texas Crim. Rep. 51; Andrus v. State, 73 Texas Crim. Rep., 329, 165 S. W. Rep., 189. For practical purposes in the trial of cases it seems to us that a condensed statement of Articles 51 and 1147, supra, might be thus made; if there be an issue as to the deadly character of the instrument used, when ordinarily used in similar cases, the question of the intent to kill should be submitted to the jury and they should be told in appropriate language that if in such case they do not find that the de-

fendant intended to kill, they could not find him guilty of any grade of felonious homicide. In other words, if A in an attack on B which results in death uses a weapon not ordinarily deadly when used in such attack, the question is,—did he intend to kill? If yea, and neither justified nor excused, he is guilty of felonious homicide. If nay,—only of some grade of assault.

In the instant case, in addition to quoting Article 1147 in his main charge, the learned trial judge gave the following special charge at the request of appellant:

"In all cases of homicide the law requires as an element of guilt an intention to kill; and if, in this case, you find that defendant did not, when he cut or stabbed deceased with a knife, (if you find that he did cut or stab him) intend to kill deceased, then you should acquit the defendant of any grade of homicide and inquire only as to whether or not he is guilty of some grade of assault and battery, under other instructions of the court." This was favorable to appellant. It assumes in effect that the knife was not deadly, and authorizes acquittal of felonious homicide, if there was no intent to kill.

This put plainly before the jury the only question necessary for them to decide in connection with Article 1147, in its application to the facts of this case, and the refusal of appellant's special charge No. 2, which he now insists requires a reversal, was not erroneous. There is nothing in Shaw v. State, 34 Texas Crim. Rep. 433, nor in the conclusion of the court in Grant v. State, 65 Texas Crim. Rep. 266, 143 S. W. Rep. 929, contrary to our views here expressed. There is much in the reasoning in the latter case which we can not follow, but the conclusion of the court in that case is expressed as follows: "Independent of Art. 717 (now 1147) appellant's purpose and intent in the difficulty under the circumstances of this case ought to have been charged as well as the provisions of said article." The distinguished jurist writing for the court in said case then concludes his opinion by saying that a special charge very similar in substance to that given in the instant case, and quoted above, should have been given. The attack made by the appellant in that case was only with nature's weapons, hands and feet, and the court expresses serious doubt as to the sufficiency of the testimony to support a conviction for homicide in any event.

We regret our inability to follow learned counsel for appellant in their conclusions regarding charges necessary in a case where the deadly character of the weapon used, is questionable. The fewer the words used, if adequate and apt in placing the legal issues involved before a jury,—the less likelihood of confusion and misunderstanding. Appellant's counsel in the preparation of the special charge given chose apt words to express the pith of Article 1147, which was that in a case such as the one on trial, before the jury

could convict of felonious homicide they must find that the accused intended to kill. We believe much confusion could be avoided by the submission of this issue in similar form. The learned trial judge gave a definition of a deadly weapon in paragraph 16 of his charge. The definition given was that usually found in charges where the question of the deadly character of the weapon used is an issue. While said charge does refer therein to the definition given as a correct one in charges heretofore and hereinafter given, there are no subsequent charges in which the expression "deadly weapon" is used.

Appellant excepted to certain parts of the argument of the State's attorney and insists that we erred in not holding same reversible error. At the risk of being tedious we quote most of the bills of exception, the argument objejcted to. The argument objected to in bill of exceptions No. 26 is as follows:

"Say to the mothers of this country who God knows suffer enough, say to them who go down in the valley of the shadow of death to bring future citizens in this country, that we will stand by you. If you don't we as well buckle on our six-shooters and go out and afford our own protection. You don't know but what some other mother's boy will be next unless you convict this defendant."

In bill No. 27 to the following:

"This man is guilty of murder and ought to be convicted. I know nothing of the facts in this case only from investigation I have made and from that I am convinced of his guilt."

In bill No. 29 to the following:

"When the defendant stabbed Willis Hopson and saw him fall dead, and said he did not know who did it, he had heard of big murder trials and with his money and lawyers behind him, he thought he would come free."

In bill No. 30 to the following:

"Close your eyes and go out and see Mrs. Lee Hopson as she goes to the funeral of her son, think of her head bowed with grief. Is it worse to send this boy to the penitentiary and bring disgrace to himself and to his father than to kill this inoffensive boy so that he can't return to his home or to the mother who gave him birth? If that is your verdict, gentlemen of the jury, there can be no enforcement of the law in the State of Texas. We stand by the dead body of Willis Hopson and in the name of the mothers of this State, appeal to you."

In bill No. 31 to the following:

"Turn this man loose if you will, wrestle with your consciences the rest of your life, go home and kiss your wife with a stained lip. Say to your wife whenever your boy is cut down like a dog, the juries of this county will turn the murderer loose and parade him as a hero."

In bill No. 32 to the following:

"Unless juries will convict under the statement of facts in this case, I don't see how the State of Texas can protect you and me. There are some people that have no fear of God or man. The only fear they have is of the penitentiary or the gallows. The only thing that will protect us from them is that the juries of the State will enforce the law of murder. Unless the juries of the State will convict these murderers the people of this state are in danger; and you are in danger and I am in danger and your boy or my boy may be the next boy murdered to have his murderer turned loose and paraded as a hero."

In bill No. 33 to the following:

"Unless you brand this boy as a murderer and send him to the penitentiary or take his life, your boy may be the next or somebody else's boy."

In bill No. 35 to the following:

"If you do not convict Jack Wolk, Jr., of murder in this case then I say turn them all loose and let the people of Coryell county buckle their pistols around them and protect themselves and let Willis Hopson's father do it and do not come to juries any more."

In bill No. 36 to the following:

"Black and Jack Wolf, Jr., had fixed the plan. Willis Hopson did not know that when he was called out that in five minutes his lips would be sealed in death; and did not know that the plan was fixed and the signal set to seal his fate; give Willis Hopson who is now dead and whose lips are sealed in death a chance."

These statements occurring in the argument are thus fully set out because increasingly complaints are here presented to arguments of State's attorneys and we are asked to reverse cases upon same. We quote approvingly from Pierson v. State, 18 Texas Crim. App. 564:

"As to the other remarks of the district attorney which were objected to, we can perceive no impropriety in them. It was the duty of the district attorney, if he thought the evidence established the guilt of the defendant, to demand his conviction. He demanded a conviction in the name of the State, in the name of law, justice and right, in the name of society, in the name of the widow and children of the deceased. We see nothing wrong in this. If the defendant committed the murder, he had acted against the peace and dignity of the State; he had outraged law, justice, right and society; he had clothed the wife in widow's weeds, and had made fatherless the children of the deceased; and each and all of these consequences of his crime demanded his conviction and punishment.

It has become quite common to except to the remarks of counsel for the State in their addresses to the jury. We find such exceptions in the majority of contested cases that come before us. If we had sustained all these exceptions, the effect would have been to have virtually closed the mouths of prosecuting attorneys. While ar-

gument should be restricted legitimately, it should not be unreasonably limited as to render it ineffectual. The State has rights in this respect as well as defendants. And in view of the frequency of exceptions of this character, we will take occasion here to say that before we will reverse a conviction because of remarks of prosecuting counsel, it must clearly appear to us, 1, that the remarks were improper, and 2, that they were of a material character, and such as, under the circumstances, were calculated to injuriously affect the defendant's rights.'[9]

In the instant case the learned trial judge gave special charges asked instructing the jury not to consider the arguments above quoted, shown in bills of exception No. 26 and special charge No. 14, which latter closed with the instruction to them to not consider any emotional and inflammatory language to the same effect but to not consider anything in making up their verdict except facts introduced in evidence, and in the qualification to bill of exceptions No. 27 makes the following statement:

"I though that these charges as given were sufficient to cover all special charges requested by the defendant. In this connection, with reference to the argument of the district attorney, I desire to say that counsel for defendant in this case as in the usual criminal case of this character, employed emotional appeals in behalf of their client; played upon the sympathy of the jury for the gray haired father of defendant and in this way provoked and invited emotional argument on the part of the district attorney."

We find in none of the arguments objected to any statements of evidence dehors the record, nor is there any personal abuse or vituperation, nor such inflammatory language as would call for a reversal of this case. Appeals to the jury to uphold the law and expressing the opinions of the attorney representing the State as to effects which might follow from adverse decision by the jury, are known to them to be but opinions and conclusions of the attorney. If State's attorneys were compelled to discuss only the facts in evidence and could make no reply in kind to appeals such as are stated to have been made in the qualification of the trial judge above set out, and could make no kind of illustrations or appeals to the jury, a limitation would thus be put upon the representatives of the State which would manifestly be unfair. Counsel for those accused of crime have practically unlimited territory to explore in appeal and argument, and unless it is shown to the satisfaction of this court that some unfair advantage is taken, some uncalled for statement made or some fact placed before the jury not in evidence, or some other character of argument indulged in by State's counsel which obviously would be calculated to mislead the jury, we would not feel called on to reverse for argument.

We fully appreciate counsel's argument regarding the seriousness

of a punishment such as was inflicted in this case for what is called the tragic ending of a boy's fight wherein the hand of fate directed the one blow struck by appellant with his knife, to a point where the great carotid artery lay so close to the surface. The question of the intent of the appellant in the use of his knife was fully submitted to the jury by the learned trial judge and doubtless similar or stronger appeals were made to the jury by able counsel representing this appellant. The solution of questions of this kind was for them or are for presentation to the Chief Executive of the State.

The motion for rehearing will be overruled.

*Overruled.*